**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MICHAEL WILLIAMS,

      Plaintiff,

      vs.                                         Civ. No. 19-58 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Michael Williams' ("Mr. Williams") Motion to Reverse and Remand for Rehearing, with Supporting Memorandum (Doc. 19) ("Motion"), filed June 17, 2019, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Mr. Williams' claim for Title II disability insurance benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on September 12, 2019, (Doc. 23), and Mr. Williams filed a reply in support of the Motion on September 30, 2019. (Doc. 24.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Mr. Williams' Motion is well taken and should be GRANTED.

## I.      BACKGROUND

Mr. Williams is a forty-year-old man who has an associate degree and whose work history includes animal caregiver, information system administrator, computer systems operator, home attendant, and computer tutor. (Administrative Record ("AR") 038, 040-43, 071.) He became

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 12.)

unable to work beginning in April 2013 following a single-vehicle motorcycle accident in southern New Mexico in which he was not wearing a helmet. (AR 040, 328, 336.) He suffered numerous injuries, including head injuries consisting of epidural hemorrhage in the left middle cranial fossa in association with fracture of the sphenoid, multi-facial factures, left zygomatic complex fracture, anterior and lateral wall left maxillary sinus fractures, left nasal bone fracture, and a complex facial laceration of the left brow. (AR 336.) Paramedics who responded to the accident witnessed Mr. Williams having a seizure at the scene, and he was airlifted to University Medical Center of El Paso. (AR 336, 449.) Mr. Williams was admitted to the surgical intensive care unit and underwent surgery on April 19, 2013 to address his head injuries. (AR 336, 338-39, 449.) He was discharged on April 25, 2013 with instructions to continue anticonvulsant medications for six months. (AR 336.)

**Post-Accident Treatment**

Mr. Williams began seeing Javed Iqbal, M.D., at Neurology Associates of Mesilla Valley on May 3, 2013. (AR 437.) At his first visit, he reported having memory loss, visual changes (blurred vision), dizziness, pain, numbness, weakness, and headaches. (Id.) At a follow-up visit in July 2013, Mr. Williams reported that "his memory issues are still very significant" and that he continued to experience weakness and numbness on the left side of his face as well as "some visual disturbances" but denied any recent seizures or headaches. (AR 439.) In September 2013, he reported that his memory "is gradually improving[,]" although he still experienced "occasional memory issues[,]" and no problems with seizures and headaches. (Id.) At that time, it was documented that Mr. Williams' "[s]trength is normal[,] [c]oordination is normal[,] [g]ait is unremarkable." (Id.) At follow-up visits in March, June, and December 2014, Dr. Iqbal documented Mr. Williams' reports of "some memory problems" as well as "anxiety and mood

difficulties" but that he had no additional reports of seizures and generally unremarkable neurological examinations. (AR 441, 443, 445.) Dr. Iqbal discontinued Mr. Williams' anticonvulsant prescription in December 2014 and instructed Mr. Williams to follow up on an as-needed basis. (AR 445.)

After being discharged from the hospital, Mr. Williams also sought follow-up care from his primary care physician, Gilberto Heredia, M.D., at White Sands Family Practice Clinic, beginning on April 29, 2013. (AR 066, 519.) At a follow-up visit on June 25, 2013, Dr. Heredia noted that Mr. Williams presented "with a psychiatric problem. The psychiatric problem(s) is described as depression and agitation." (AR 513.) Dr. Heredia described the problems—which he stated "occurred after trauma"—as "moderate," though "fluctuat[ing] in intensity and . . . worsening," and noted that "[e]xacerbating factors consist of emotional stress and noisy environment." (Id.) He diagnosed Mr. Williams with, *inter alia*,[2] anxiety disorder, major depressive disorder (recurrent episode), mild traumatic brain injury ("TBI"), and history of epidural hemorrhage, and he began treating Mr. Williams with antidepressants. (AR 510, 514.) Dr. Heredia continued treating Mr. Williams' psychiatric problems with various prescription medications for several years. (*See* AR 476-511, 651-65.) In February 2017, he completed a long-term disability form in which he opined that Mr. Williams "is able to engage in only limited stress situations and engage in only limited interpersonal relations[.]" (AR 679.) Dr. Heredia indicated diagnoses of the following medical conditions that he believed impacted Mr. Williams' ability to work: TBI, traumatic facial neuropathy, outbursts of anger, major depressive disorder, GERD without esophagitis, and anxiety. (AR 679.) He documented restrictions and limitations in Mr. Williams' ability to finely manipulate, power grasp, push/pull, keyboard, reach above shoulder

---

[2] The record indicates that Dr. Heredia diagnosed Mr. Williams with and treated him for many different conditions over the years. The Court discusses only those that relate to the issues on appeal.

level, reach at waist level/below waist, bend/twist/squat, and climb/balance. (AR 680.) He additionally noted that Mr. Williams "has severe anxiety and thus limitations in potentially stressful situations even if they are simple interactions with others[.]" (Id.) In response to a question asking if there are "any reasonable accommodations which might assist in a successful rehabilitation and return to work in some manner[,]" Dr. Heredia indicated, "simple tasks, stress[-]free environment with minimal interactions w[ith] others[.]" (Id.)

After his accident, Mr. Williams additionally reestablished treatment with Robin LaRocque, LPCC, the counselor he had gone to in 2012 for marriage counseling. (AR 064, 670.) LPCC LaRocque diagnosed Mr. Williams with posttraumatic stress disorder ("PTSD"), major depressive disorder, generalized anxiety disorder, and TBI and treated him on a monthly, sometimes weekly, basis through at least May 2017. (AR 065, 524, 670, 681.) In a September 2015 to-whom-it-may-concern letter, LPCC LaRocque explained:

> Since the traumatic brain injury[,] [Mr. Williams] has been suffering from multiple symptoms. He reports he gets easily confused, easily distracted, and easily angered. He has difficulty being around small to large gatherings of people, even family. Michael reports he was very outgoing and enjoyed a very active social life before this accident. He has since been put on temporary disability and can't work at the job he was employed with before the accident.

(AR 524.) She stated that while Mr. Williams "has attended his scheduled therapy sessions[] and has been fully engaged in treatment[,]" it was her opinion that "[d]ue to the severity of [his] head injury, his prognosis is poor regarding his ability to be employed." (Id.) In a February 2017 to-whom-it-may-concern letter, she indicated that despite continuing to be "fully engaged" in regular treatment, Mr. Williams' "symptoms have not improved[;] in fact, they have increased." (AR 675-76.) Explaining that prior to his accident, she viewed Mr. Williams as "a very optimistic person with great insight [who] had positive, attainable goals[,]" LPCC LaRocque stated in her February 2017 letter that she has "seen a steady decline in his mental and physical abilities since [his]

accident." (AR 675.) Reiterating the difficulty he experiences being around small to large gatherings of people, she stated, "[h]e continues to struggle in social settings and reports he feels uncomfortable if there [are] more than two people around him, to include his family" and indicated that she was working with him "to help him develop coping skills to reduce his anxiety around others." (AR 676.) In February 2017, LPCC LaRocque completed a mental residual functional capacity ("MRFC") questionnaire in which she offered opinions as to Mr. Williams' limitations with respect to the mental abilities and aptitudes needed to do particular kinds of work. (AR 670-74.) She indicated her opinion that Mr. Williams is either unable to meet competitive standards or has no useful ability to function in the vast majority of abilities and aptitudes assessed. (AR 672-73.)

**Psychological Evaluations**

In April 2014, Mary Ann Cotten, Ph.D., completed a psychological evaluation of Mr. Williams "for treatment planning purposes." (AR 449.) In addition to major depression and general anxiety disorder, her diagnostic impressions included "Traumatic Brain Injury" based on Mr. Williams' Trails A & B[3] test scores, which Dr. Cotten opined were "suggestive of moderate brain damage." (AR 455-56, 457.) After conducting a clinical interview and administering a battery of tests, Dr. Cotten offered a prognosis of "[h]ighly [g]uarded" regarding Mr. Williams' "employability status." (AR 457.) While she found that he has only a moderate limitation in his ability to "recall detailed and complex instructions" and only a mild limitation in his ability to respond appropriately to very short[,] simple instructions[,]" she found that test results indicated that Mr. Williams has marked limitations in the following areas of functioning: "ability to sustain concentration;" "ability to persist at tasks"; and "social interactions." (AR 457.)

---

[3] According to Dr. Cotten's report, "[t]he Trails A & B are tests of speed for attention, sequencing, mental flexibility, and of visual search and motor functioning." (AR 456.)

In July 2015, Marc Caplan, Ph.D., conducted a neuropsychological evaluation "to assist in making a differential diagnosis and establishing a baseline of functional ability." (AR 638.) Dr. Caplan indicated diagnostic impressions of major depressive disorder, generalized anxiety disorder, and mild neurocognitive disorder due to TBI. (AR 650.) He described Mr. Williams as "a man who presents with impairments of attention" and noted "some deficit in cognitive flexibility and divided attention (multitasking)" as well as "mild deficits in short[-]term memory[.]" (Id.) In discussing his recommendations, he explained:

> Neuropsychiatric illnesses such as mood disorders are highly prevalent complications of TBI. The presence of mood disorders is a complicating factor in both the evaluation of individuals post trauma as well as in rehabilitation. Major Depressive Disorders (MDD) generally have an adverse impact on memory and attention as do[] anxiety disorders. . . .
>
> Treatment must involve focus on resolving symptoms related to mood disorders. With resolution of depressive and anxiety symptoms there is likely to be improvement in his neuropsychology. . . . Consideration should also be given to utilization of cognitive rehabilitation techniques.

(Id.)

## State Agency Reviewers

Mr. Williams filed his claim for disability insurance benefits on December 29, 2014. (AR 119.) State agency consultants Robbie Ronin, Psy.D., and R. Chahal, M.D., reviewed Mr. Williams' case at the initial and reconsideration levels in July 2015 and November 2015, respectively. (AR 082-97, 100-15.) In relevant part, both reviewers found that Mr. Williams

> has the ability to remember locations and work-like procedure, and the ability to understand and remember very short and simple instructions. . . . [Mr. Williams] has the ability to maintain attention and concentration for extended periods.
>
> . . . [Mr. Williams] has sufficient concentration and persistence to complete simple tasks. . . . [Mr. Williams] has the ability to accept instructions and respond appropriately to criticism from supervisors.

> Documentation in file indicates [Mr. Williams] is not well-suited for meeting the demands of working with the general public.
>
> . . . [Mr. Williams] can interact appropriately with supervisors and coworkers.

(AR 096, 115.) Both reviewers acknowledged that LPCC LaRocque and Dr. Cotten assessed greater mental limitations and restrictions but found their opinions "less persuasive" because they found the opinions to be "without substantial support from other evidence of record[.]" (AR 097, 116.)

**The ALJ's Decision**

The ALJ found that Mr. Williams has two severe impairments—"affective and anxiety disorders"—but that neither was presumptively disabling under the Social Security Listings.[4] (AR 012.) He therefore proceeded to assess Mr. Williams' residual functional capacity ("RFC"), finding that through his date last insured (June 30, 2017) (AR 012), Mr. Williams

> had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he can understand, carry out, and remember simple one to three step instructions and make commensurate work-related decisions, respond appropriately to supervision, coworkers, and work situations, deal with routine changes in work setting, maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout a normal workday. [Mr. Williams] is limited to simple, routine, and repetitive tasks and is suitable for jobs involving occasional superficial interaction with the general public.

(AR 014.) In discussing the evidence supporting this RFC, the ALJ accorded "[g]reat weight" to the opinions of Drs. Ronin and Chahal because "they were able to have a good overview of the record; their conclusions are well-explained; and the doctors are familiar with the agency's disability standards." (AR 017.) He gave "[l]ittle weight" to the opinions of LPCC LaRocque (AR 017-18) and "[s]ome weight" to the opinions of Dr. Cotten. (AR 016.) With respect to Dr. Heredia, the ALJ recognized Dr. Heredia as Mr. Williams' "treating physician" and accorded his opinions

---

[4] *See* 20 C.F.R. 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A.

"[s]ome weight[.]" (AR 017.) He rejected Dr. Heredia's opinion regarding Mr. Williams' physical limitations because he found that Dr. Heredia "does not provide significant explanation for physical limits and they are not consistent with the medical record or [Mr. Williams'] own reports." (Id.) However, he found that Dr. Heredia's "findings regarding [Mr. Williams'] mental limitations are consistent with, and supported by, the other evidence of record. Therefore, I find [Mr. Williams] is limited to unskilled work with limited social interaction as opined by Dr. Heredia." (Id.)

Although the ALJ found that Mr. Williams could not perform his past relevant work given the RFC he assessed (AR 018-19), he found that Mr. Williams would be able to perform other jobs that exist in significant numbers in the national economy. (AR 019-20.) He therefore found that Mr. Williams was "not disabled." (AR 020.) Mr. Williams sought review by the Appeals Council, which denied Mr. Williams' request. (AR 001-6, 196-98.) Mr. Williams then appealed to this Court. (Doc. 1.)

## II.  APPLICABLE LAW

### A.  Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10

F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

**B.      Disability Benefits and the Sequential Evaluation Process**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i-iv). If the claimant can show that an impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops. 20 C.F.R. § 404.1520(a)(4)(iii). If at step three the claimant's impairment is not equivalent to a listed impairment, the ALJ must next consider all of the relevant medical and other evidence and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations. 20 C.F.R. § 404.1545(a)(1)-(3). This is called the claimant's residual functional capacity. 20 C.F.R. § 404.1545(a)(1), (a)(3). The claimant's RFC is used at step four of the process to determine if he can perform the physical and mental demands of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv), (e). In reaching a determination regarding the claimant's RFC, the ALJ must consider the limiting effects of *all* of the claimant's impairments, not only those found to be "severe" at step two. 20 C.F.R. § 404.1545(e). If the claimant establishes that he is incapable of meeting the demands of his past relevant work, the burden of proof then shifts to the Commissioner at step five to show that the claimant is able to perform other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Grogan*, 399 F.3d at 1261.

**C.      Consideration and Evaluation of Evidence, and Weighing of Opinions**

The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03P, 2006 WL 2329939, at *4 (Aug. 9, 2006).[5] Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting his decision but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. The ALJ's decision must demonstrate application of the correct legal standards applicable to different types of evidence, and failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).

Regarding opinion evidence, the ALJ is required to discuss the weight assigned to each opinion of record applying the factors set forth in 20 C.F.R. § 404.1527(c)(1)-(6). *See* 20 C.F.R. § 404.1527(c), (f)(2); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). Generally, the ALJ should accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. § 404.1527(c)(1); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). Indeed, a treating source's medical opinions are entitled to controlling weight, i.e., must be adopted, if they are well-supported and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *see* SSR 96-2P, 1996 WL 374188, at * 1 (July

---

[5] The Court acknowledges that certain Social Security Rulings, including SSR 06-03P, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, Mr. Williams filed his claim for disability insurance benefits on December 29, 2014 (AR 119), making the rescinded rulings and case law interpreting them still applicable.

2, 1996) ("If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."). If the ALJ rejects the opinions of a treating source in favor of a non-examining source's opinion, he must provide specific, legitimate reasons for doing so. *See Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003). The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." *Robinson*, 366 F.3d at 1082 (quotation marks omitted). An ALJ's failure to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and demonstrate that he has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes*, 842 F.2d at 244. Additionally, if an RFC assessment "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at * 7 (July 2, 1996).

## III.   ANALYSIS

**A.      The ALJ's decision fails to demonstrate application of the correct legal standard for weighing the medical opinions of record regarding Mr. Williams' mental limitations.**

The ALJ correctly recognized Dr. Heredia as Mr. Williams' treating physician. (AR 017.) He also correctly recognized that Dr. Heredia offered separate opinions regarding the physical *and* mental limitations that affect Mr. Williams' ability to work.[6] (Id.) While he rejected Dr. Heredia's opinions regarding Mr. Williams' physical limitations, he found that Dr. Heredia's "findings regarding [Mr. Williams'] mental limitations are consistent with, and supported by, the other evidence of record." (Id.) This finding supports, indeed compels, according controlling weight to Dr. Heredia's opinions regarding Mr. Williams' mental limitations. *See* 20 C.F.R.

---

[6] The Court discusses only Dr. Heredia's opinions regarding Mr. Williams' mental limitations in this section. Dr. Heredia's opinions regarding Mr. Williams' physical limitations are discussed in the next section.

§ 404.1527(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). If entitled to controlling weight, the ALJ was required to adopt Dr. Heredia's opinions "irrespective of any finding he or she would have made in the absence of the medical opinion." SSR 96-2P, 1996 WL 374188, at * 2. However, as Mr. Williams points out, the ALJ's RFC does not incorporate all of the mental limitations found by Dr. Heredia. Specifically, the Court understands Mr. Williams to complain that the ALJ appears to have either overlooked or rejected that aspect of Dr. Heredia's opinion indicating that Mr. Williams is restricted, generally, in his ability to interact with others by finding, in accordance with the state agency reviewers' opinions, that Mr. Williams "can . . . respond appropriately to supervision[ and] coworkers" and by placing a limitation only on his ability to interact with the general public. (AR 014.) Mr. Williams argues that the ALJ's failure to either adopt all of the mental limitations found by Dr. Heredia or explain why he was rejecting them in favor of non-examining state agency reviewers' opinions constitutes reversible error.[7] (Doc. 19 at 12.) The Court agrees.

---

[7] Confusingly, the ALJ's review of the opinion evidence began with a consideration of the state agency reviewers' opinions regarding Mr. Williams' mental limitations. Only after according "[g]reat weight" to those opinions did the ALJ proceed to consider Dr. Heredia's opinions. (*See* AR 017.) This alone is problematic because when the record contains medical opinions from a treating source, the weighing of medical opinions must proceed through a sequential process with consideration *first* being given to whether the treating source's opinions are entitled to controlling weight. *See Watkins*, 350 F.3d at 1300 (describing the analysis for considering medical opinions as "sequential" and explaining that "[i]n deciding how much weight to give a treating source, an ALJ must first determine whether the opinion qualifies for 'controlling weight'"); SSR 96-2P, 1996 WL 374188, at * 2 (providing that "when all of the factors [for according controlling weight to an opinion] are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion"). It is particularly problematic on the record in this case because, as just noted, the ALJ's decision includes a finding that supports entitling Dr. Heredia's mental-limitations opinions to controlling weight.

Dr. Heredia opined, *inter alia*, that due to his "severe anxiety[,]" Mr. Williams should be restricted to "minimal interactions w[ith] others[.]" (AR 680.) He also opined that Mr. Williams "is able to engage in only limited stress situations and engage in only limited interpersonal relations[.]" (AR 679.) Mr. Williams argues that the ALJ's finding that Mr. Williams "can . . . respond appropriately to supervision[ and] coworkers" is "inconsistent" with, and that the ALJ's RFC assessment limiting Mr. Williams to "jobs involving occasional superficial interaction with the general public" fails to fully account for, those particular opinions. (Doc. 19 at 11-12; Doc. 24 at 2.) The Commissioner counters that the ALJ's finding that Mr. Williams can only have occasional superficial social contact with the general public sufficiently translated and encompassed Dr. Heredia's "check-the-box finding that [Mr. Williams] could have 'limited interpersonal relations[.]'" (Doc. 23 at 12.) The problem with the Commissioner's argument is that it fails to appreciate, distinguish between, and sufficiently address Dr. Heredia's separate opinions bearing upon the determination of disability in this case. The ALJ's decision itself suffers from the same infirmity, necessitating remand because the Court is unable to follow the ALJ's decision, which is unclear as well as internally inconsistent as written. The Court explains.

Dr. Heredia's opinions regarding Mr. Williams' work-related mental limitations are not documented on a standardized form, such as a MRFC questionnaire. Rather, they are principally contained in the long-term disability form that Dr. Heredia completed for what appears to be Mr. Williams' private disability insurance carrier in February 2017. (*See* AR 245 (noting that Mr. Williams was receiving short- and long-term disability payments), 679-80 (indicating that the form Dr. Heredia completed should be returned to Principal Life Insurance Company).) That form neither purports to correlate to the standards for determining disability under the Social Security Act nor requires detailed documentation of an insured's ability to meet specific mental demands.

Therefore, and as the Commissioner correctly points out, it was the ALJ's duty to translate Dr. Heredia's opinions contained on that form into a suitable RFC. *See Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004) ("[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."). (Doc. 23 at 12 (citing *Howard*, 379 F.3d at 949).) In doing so, the ALJ also was to have determined "whether, and the extent to which, it is necessary to address separately each medical opinion from a single source." SSR 96-2P, 1996 WL 374188, at * 2. The ALJ's failure to do the latter in this case resulted in a commensurate failure to comply with the former.

The ALJ's decision evinces that he did not address separately each of Dr. Heredia's opinions as to Mr. Williams' specific mental limitations. As previously noted, the ALJ generally found that Dr. Heredia's "findings regarding [Mr. Williams'] mental limitations are consistent with, and supported by, the other evidence of record." But Dr. Heredia's "findings" encompassed separate opinions about distinct mental limitations, some of which the ALJ clearly adopted, but others that he did not. For example, Dr. Heredia opined that Mr. Williams is unable to perform work involving higher complex functioning. (AR 464.) The ALJ acknowledged this opinion (AR 017) and adopted it by translating it into an RFC limitation that Mr. Williams "can understand, carry out, and remember simple one to three step instructions and make commensurate work-related decisions" and "is limited to simple, routine, and repetitive tasks[.]" (AR 014.) The Court finds—and Mr. Williams complains of—no error regarding the ALJ's handling of that specific opinion.

Where the Court finds reversible error is in the ALJ's handling of Dr. Heredia's opinions that Mr. Williams could "engage in only limited interpersonal relations" and should be limited to "minimal contact w[ith] others" due to his "severe anxiety[.]" (AR 679, 680.) The ALJ

acknowledged Dr. Heredia's opinion that Mr. Williams should engage in only limited interpersonal relations and indeed found that Mr. Williams should be "limited to unskilled work *with limited social interaction* as opined by Dr. Heredia." (AR 017 (emphasis added).) However, the RFC the ALJ ultimately adopted did not in fact include a "limited social interaction" restriction—or commensurate limitation(s)—reflecting Dr. Heredia's opinion. The ALJ's finding that Mr. Williams should be "limited to . . . jobs involving occasional superficial interaction with the general public" fails to fully account for Dr. Heredia's generalized opinion regarding Mr. Williams' social limitations. Notably, the abilities to, on a sustained basis, "accept instructions and respond appropriately to criticism from supervisors" and "get along with coworkers or peers without (unduly) distracting them or exhibiting behavioral extremes" are two of the basic mental demands required of those engaged in unskilled work. Program Operations Manual System ("POMS") § DI 25020.010. A limitation in either of these abilities has the potential to affect a disability determination. *See* POMS § DI 25020.010A.3.b ("A substantial loss of ability to meet *any* of the basic mental demands" of unskilled work "severely limits the potential occupation base and thus, would justify a finding of inability to perform other work even for persons with favorable age, education and work experience." (emphasis added)). A limitation to "occasional superficial interaction with the general public" plainly does not address or account for a limitation in one's ability to engage in "interpersonal relations" and interact appropriately with "others" generally.

Relatedly, the Court agrees with Mr. Williams that the ALJ's finding that Mr. Williams can respond appropriately to supervision and coworkers without limitation is not only inconsistent with Dr. Heredia's opinion that Mr. Williams should have "minimal contact w[ith] others" but also cannot be reconciled with the ALJ's own finding that Mr. Williams should be "limited to unskilled work with limited social interaction as opined by Dr. Heredia." The ALJ's inconsistent findings

make it difficult—if not impossible—for the Court to understand both the weight the ALJ assigned to Dr. Heredia's opinions and the reasons for that weight. To the extent the ALJ intended to accord controlling weight to only certain of Dr. Heredia's opinions, it was his responsibility to make that clear in the first instance and then to explain his reasons for doing so. Moreover, because he appears to have adopted the opinions of non-examining state agency reviewers Drs. Ronin and Chahal regarding Mr. Williams' ability to interact with supervisors and coworkers over the opinion of treating physician Dr. Heredia, the ALJ was further to have provided specific, legitimate reasons for doing so. He did neither.

In short, the ALJ's decision is confusing, inconsistent, and generally unclear regarding the critical question of what weight the ALJ accorded to the opinions of Mr. Williams' treating physician regarding Mr. Williams' mental impairments and why. Because the ALJ's decision fails to evince application of the correct legal standard for weighing Dr. Heredia's opinions regarding Mr. Williams' mental limitations, remand is required.

**B.    The ALJ's decision similarly fails to demonstrate application of the correct legal standard for weighing Dr. Heredia's medical opinions regarding Mr. Williams' *physical* limitations.**

In the long-term disability form he completed in February 2017, Dr. Heredia noted that he had placed Mr. Williams on the following physical restrictions: (1) occasional (i.e., up to one-third of the time) fine manipulation, and (2) frequent but not continuous (i.e., up to but no more than two-thirds of the time) power grasping, pushing/pulling, keyboarding, reaching above shoulder level, reaching at waist level/below waist level, bending/twisting/squatting, and climbing/balancing. (AR 680.) The ALJ rejected these restrictions outright because he found that Dr. Heredia "does not provide significant explanation for physical limits and they are not consistent with the medical record or [Mr. Williams'] own reports." (AR 017.) Mr. Williams

argues that the ALJ "failed to properly discount or cite evidence contrary to Mr. Williams' physical limitations" and that "[h]ad the ALJ properly considered Dr. Heredia's opinions, Mr. Williams would have received a more limited RFC with regard to his physical abilities." (Doc. 19 at 10, 11.) The Court agrees in part.

As noted previously, Dr. Heredia's treating source medical opinions were entitled to controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence" of record. 20 C.F.R. § 404.1527(c)(2). The ALJ's decision fails to evince that he properly considered, as a threshold matter, whether Dr. Heredia's opinions regarding Mr. Williams physical limitations were entitled to controlling weight. *See Watkins*, 350 F.3d at 1300. Absent from the ALJ's decision is any indication that he considered whether Dr. Heredia's opinion was (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) not inconsistent with the other substantial evidence of record. Notably, the record undisputedly establishes that Mr. Williams sustained a TBI in his 2013 motorcycle accident, an injury that every medical provider who treated him thereafter diagnosed and believed contributes to Mr. Williams' ongoing impairments. (*See* AR 437, 457, 514, 524, 650.) Despite the clear centrality of Mr. Williams' TBI to a determination of disability in this case, the ALJ's decision contains no mention—let alone a meaningful discussion—of Mr. Williams' TBI. Having failed to even acknowledge numerous providers' independent diagnosis of and treatment for a TBI, the ALJ cannot have complied with his duty to evaluate Dr. Heredia's opinion vis-à-vis its consistency with and supportability based on the record as a whole. *See* 20 C.F.R. § 404.1545(e) (providing that in determining a claimant's RFC, "we will consider the limiting effects of all your impairment(s), even those that are not severe"); *Clifton*, 79 F.3d at 10 (explaining that the ALJ must discuss not only the evidence supporting his decision but

also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects").

Additionally, the ALJ's conclusory finding that the physical limitations indicated by Dr. Heredia "are not consistent with the medical record or [Mr. Williams'] own reports" is insufficient to satisfy the ALJ's duty to provide specific and clear reasons for according Dr. Heredia's opinion regarding Mr. Williams' physical limitations no weight. First, regarding the ALJ's finding that Mr. Williams "did not testify to any physical impairments" (AR 015), the Court agrees with Mr. Williams that that finding is not supported by substantial evidence and, therefore, cannot serve as a proper basis for the ALJ's rejection of Dr. Heredia's opinion. (Doc. 19 at 11.) The record is clear that at his administrative hearing, Mr. Williams testified to having "slight balance issues[,]" getting "a little wobbly" when walking, and feeling like "the world will spin on me" when standing up. (AR 060.) He additionally testified that when he tries to play the drums, "[t]here is something not connecting with the left side of my body rhythmically" and described the left side of his body as having "a little bit of a lag to it." (AR 052.) In a statement he wrote in February 2017, Mr. Williams explained:

> After the accident, I could no longer play the drums, something I have been known to be extremely talented at[] since I was a kid. I can only explain it as, my brain does not fire correctly with my left side. When not playing drums, I cannot notice any weakness, aside from slight balance issues sometimes. But when trying to play drums, my left side is weaker and does not hit on time[.]

(AR 318.) The ALJ's decision reflects no consideration of any of the foregoing evidence, evidence that not only undercuts the ALJ's finding that Mr. Williams "did not testify to any physical impairments" (AR 015) but also is significantly probative of whether Dr. Heredia's opinion regarding Mr. Williams' physical limitations were "not inconsistent" with the evidence of record.

The ALJ's failure to explain why he was rejecting evidence related to Mr. Williams' physical impairments constitutes error. *See Clifton*, 79 F.3d at 1010.

Second, regarding consistency with the medical record, the ALJ's decision included nothing more than the conclusory statement that the physical restrictions Dr. Heredia imposed "are not consistent with the medical record or [Mr. Williams'] own reports." (AR 017.) He cited no medical record even suggestive of an inconsistency with Dr. Heredia's opinion regarding Mr. Williams' physical limitations.[8] (AR 017.) In his Response, the Commissioner reasons that "Dr. Heredia's treatment notes show that [Mr. Williams] did not complain of any back, foot, or hand pain" and that "at appointments with neurologist Dr. Iqbal, [Mr. Williams'] strength, gait, and coordination were all normal" as evidence supporting the ALJ's finding that Dr. Heredia's physical restrictions were inconsistent with other evidence. (Doc. 23 at 12-13.) While the evidence the Commissioner cites arguably suggests possible inconsistencies, it fails to support the ALJ's decision for two reasons. First, it was not relied upon by the ALJ as a basis for rejecting Dr. Heredia's opinion. *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself"). Second, the restrictions Dr. Heredia placed Mr. Williams on are not necessarily inconsistent with evidence indicating that Mr. Williams reported no back, foot, or hand pain and had normal strength, gait, and coordination, particularly on the record considered as a whole. As just discussed, Mr. Williams described specific problems

---

[8] In fact, in the paragraph immediately following his review of Dr. Heredia's opinions, the ALJ discussed LPCC LaRocque's opinions regarding Mr. Williams' physical limitations, opinions that were consistent with—and indeed documented greater restrictions than—those indicated by Dr. Heredia. Like Dr. Heredia, LPCC LaRocque opined that Mr. Williams is limited to frequently climbing and balancing. (*See* AR 017; *compare* AR 678, *with* AR 680.) In all other areas of physical functioning, LPCC LaRocque assessed Mr. Williams has having greater limitations than did Dr. Heredia. (Id.) The Court acknowledges that the ALJ accorded LPCC LaRocque's opinions only "[s]ome weight," but regardless of the weight her opinions were accorded, they nonetheless are evidence reflecting the consistency of Dr. Heredia's opinions that the ALJ's decision should at least reflect consideration of.

with balance and sensory disconnection on the left side of his body in specific contexts, i.e., problems that would not necessarily cause pain or be detectable during a standard neurological examination as part of a routine follow-up visit. Rather, they could conceivably lead to the work-related restrictions such as those Dr. Heredia placed on Mr. Williams despite the absence of pain and even given "normal" neurological examinations in 2013. Notably, the term "[n]ot inconsistent" is used "to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." SSR 96-2P, 1996 WL 374188, at * 3. The evidence cited by the Commissioner does not on its own either contradict or conflict with Dr. Heredia's opinions that Mr. Williams has physical limitations in his ability to do things such as bend, twist, squat, climb, balance, and keyboard. Absent an explanation by the ALJ in the first instance of how the cited evidence, viewed in light of the whole record rather than cherrypicked as by the Commissioner, supports rejection of Dr. Heredia's treating source opinion, the Commissioner's argument necessarily fails.

The Court agrees with Mr. Williams that the ALJ's consideration of Dr. Heredia's opinions regarding Mr. Williams' physical limitations, like his consideration of Dr. Heredia's opinions regarding Mr. Williams' mental limitations, fails to evince proper consideration of both the evidence and the medical opinions of record pertaining to those limitations. Remand is therefore necessary on this basis as well.

## C.     The Court Does Not Reach Mr. Williams' Other Arguments

Because the Court concludes that remand is required as set forth above, the Court will not address Mr. Williams' remaining claims of error. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299

(10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand). The Court notes, however, that the deficiencies in the ALJ's decision that the Court has analyzed in detail above are not limited to the ALJ's handling of Dr. Heredia's opinions. As a general matter, the ALJ's RFC discussion fails to evince that the ALJ complied with his duties to consider the evidence holistically and weigh all of the opinions of record in accordance with the applicable regulations.[9] On remand, the Commissioner should take care to address the deficiencies contained throughout the ALJ's decision in order to facilitate meaningful future review, if necessary.

## IV.   CONCLUSION

For the reasons stated above, Mr. Williams' Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 19) is GRANTED.

_Kirtan Khalsa_

KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent

---

[9] As just one example, the explanations the ALJ provided for according the weight he did to Dr. Cotten's and LPCC LaRocque's respective opinions are conclusory, generic, and lack any meaningful explanation reflecting that he properly considered them in accordance with the applicable factors for weighing non-controlling opinions. Indeed, his explanations appear to be nothing more than boilerplate statements for which no effort was made to tailor the explanations to the record in this case in even the most basic of ways. For example, the ALJ's explanation of why he accorded only some weight to Dr. *Mary Anne* Cotten's opinions was, in its entirety: "Dr. Cotton [sic] performed a single examination and did not have a complete review of the record available to *him*. *His* conclusions overstate limitations supported by *his* own examination and therefore cannot be given greater weight." (AR 016 (emphases added).) On both its facial errors and its lack of substance, this explanation is deficient.